ADAMS *vs.* HIS CREDITORS.

APPEAL FROM THE COURT OF THE FOURTH JUDICIAL DISTRICT, FOR THE PARISH OF IBERVILLE, JUDGE COOLEY, THE THEN JUDGE OF THE DISTRICT, PRESIDING.

In a *concurso*, where all the parties are plaintiffs and defendants, any averment made by *one creditor*, in relation to a particular claim, as a charge or allegation of fraud, must *avail all the other* opposing creditors, interested in defeating it; because a claim cannot be rejected as to some creditors, and upheld as to others.

The allegation of fraud and collusion against a judgment, puts the party in whose favor it is rendered, to the proof of the facts on which it is based.

A party seeking to recover, must make his claim certain ; it is not enough to render it only probable.

In relation to property acquired by illicit traffic, a partner stands in a different light from creditors ; they claim to be paid out of the general assets of their debtor, the partner seeks for one-half of the property, unlawfully acquired, and cannot be listened to.

Where the signatures of the proper officers of a corporation are proved, and the seal is affixed, the courts are to presume the officers did not transcend their authority, and that the seal was affixed according to the requirements of the charter.

Courts may, however, when a deed is signed by the officers and sealed with the seal of the corporation, look beyond the seal, but it is *prima facie* evidence that it was so affixed by proper authority. The contrary must be shown by the adverse party.

On the 9th March, 1833, the plaintiff filed his petition and bilan, and obtained a stay of proceedings, under the insolvent laws.

He placed his daughter, Mrs. P. Andrews, on his bilan as a privileged creditor of the first rank, on account of a judgment she had obtained against him in the Probate Court for fifty-three thousand eight hundred and forty-seven dollars, for her mother's half of the succession, as it stood at her decease in 1819.

Also, a claim held by the Mercantile Insurance Company of New-York, originally belonging to the Life and Fire Insurance Company of New-York, for the sum of thirty-seven thousand seven hundred dollars, and likewise a judgment debt due to the syndics of W. Kenner & Company, for six thousand eight hundred and ninety-one dollars, and a judgment debt held by Josiah Barker, for four thousand dollars, with other privileged and ordinary debts to a large amount. Syndics were appointed to take charge and sell the property, and distribute the proceeds among the creditors.

On the 26th September, 1836, after making sales of the property surrendered, the syndic filed a provisional tableau

of distribution.  He alleges, that the net amount of sales is seventy-seven thousand one hundred dollars, payable in three instalments, and that after paying law charges and necessary expenses of administration, there remains a balance in his hands of eighteen thousand two hundred and fifty-three dollars.  He further alleges, that Mrs. P. Andrews, daughter of the insolvent, is a privileged creditor, in virtue of the right of inheritance from her deceased mother, to the amount of one hundred and eight thousand five hundred and fifty dollars, which he places on the tableau as a privileged claim of the first class, and appropriates the balance in his hands to its partial payment.  He prays, that said accounts and tableau be received and homologated.

The Mercantile Insurance Company of New-York, Josiah Barker, and the syndic of Kenner & Company, with other creditors, made opposition to the tableau, and particularly to the claim of Mrs. P. Andrews, denying that she was entitled to any sum in right of her mother ; alleging, that the community existing between her and the insolvent, at the time of its dissolution, was of no value, and, in fact, insolvent.  Some other opponents alleged, that her judgment against the insolvent was fraudulent and collusive, and obtained in fraud of the *bona fide* creditors.  The oppositions were principally directed against this judgment, and also against the allowance of the sum to Mrs. Andrews, on the ground that the evidence showed the community was insolvent in 1819, the time of its dissolution.

On these several oppositions, a mass of testimony was taken, and various proceedings had, which come up in two heavy and confused records.

After hearing all the parties, and wading through the immense mass of evidence of every kind, the district judge came to the conclusion, that all the property and effects which was in the possession of the insolvent at the death of his wife, must be considered as belonging to the community, unless the contrary was shown, and that Mrs. P. Andrews, being the only surviving heir of the insolvent and his deceased wife, and a minor at the time of the dissolution of

the community, was entitled, by mortgage and privilege, to one-half of the same, after deducting debts, &c. ; and that the testimony showed the one-half of the community was worth considerably more than the sum now offered to be distributed. Judgment was rendered, homologating the tableau, and ordering the balance on hand to be paid to Mrs. P. Andrews, after deducting costs. The opposing creditors appealed.

EASTERN DIST.
February, 1840.

ADAMS
vs.
HIS CREDITORS.

*Ives,* for the appellee, Mrs. P. Andrews.

*Jacob Barker,* argued the case for the New-York Mercantile Insurance Company, Kenner's syndic, and Josiah Barker, appellants.

*Morphy, J.,* delivered the opinion of the court.

An account current of his administration was filed by the syndic, in this case, showing a sum of eighteen thousand two hundred and fifty-three dollars, then ready for distribution. It was accompanied by a petition, setting forth that Penelope Adams, wife of John Andrews, is a privileged creditor for one hundred and eight thousand five hundred and fifty dollars, being the amount accruing to her from the estate of her mother, Susan Johnson, the deceased wife of the insolvent. She is therein set down as entitled to the whole balance, in part payment of her claim. To this tableau of distribution, if it can be so called, a number of oppositions were filed, all directed against this claim, which, if admitted, would render all further litigation, among the other creditors, useless and unprofitable, all the assets of the estate amounting only to about seventy-seven thousand dollars. The multifarious pleadings below, together with the mass of oral and documentary evidence adduced, have formed one of the most confused and unwieldy records ever, perhaps, presented to the examination of this court. The judge below, has been contented with stating, that Mrs. Andrews' rights greatly exceeded the sum then in the hands of the syndic, and has decreed said sum to her, in part payment of her claim, without fixing its amount, and without

passing on any of the claims of the opposing creditors. With such a judgment before us, we would, perhaps, be justified in reversing it, and remanding the case for further proceedings, that something more definite should be sent up for our revision ; but we have been requested by all parties, to pronounce on the claims of Mrs. Andrews, Mr. Andrews, and of the Mercantile Insurance Company of New York.

On the death of Susan Johnson, the mother of Mrs. Andrews, no inventory appears to have been taken, nor any steps towards a liquidation of the community. A few months before Adams failed, his daughter obtained against him, in the Probate Court of Iberville, a judgment, decreeing to her, for her mother's half of the community, fifty-three thousand eight hundred and forty-seven dollars and fifty cents, independent of her undivided interest in certain pieces of property, supposed to have belonged to the community. This judgment, upon which Mrs. Andrews rests her main hopes for success in this court, has produced a protracted and angry debate between her counsel and those of the opposing creditors. Professional zeal, and, perhaps, a too lively sensibility for the feelings of their clients, have induced counsel to indulge in sarcasm and personal remarks, which, far from assisting us in the performance of our duties, render them more difficult and somewhat unpleasant. With the character and general reputation of the parties litigating before us, we have nothing to do. We sit here in judgment on their legal rights, and permit no impressions to be made on our minds but such as may result from the evidence exhibited by the record.

This judgment is attacked by one of the opposing creditors as having been obtained through fraud and collusion, and by another as having been rendered by consent, which we understand to be, in substance, the same charge. Although the Mercantile Insurance Company, with whom this contest has been mainly carried on in this court, has not made any such allegation, we think that in a *concurso*, where all the parties are plaintiffs and defendants, any averment, made by one creditor, in relation to a particular claim, must

avail all the other opposing creditors interested in defeating it; because a claim cannot be rejected as to some creditors, and upheld as to others. Appellee's counsel has contended, that Mrs. Andrews' judgment is binding and conclusive, and that some evidence or color of fraud must be shown before she can be put to the proof of her claim. We consider it well settled law on this subject, that the allegation of fraud and collusion has the effect of putting the party to the proof of the facts on which the judgment purports to be based. It implies that no evidence was given, nor a proper defence made; it involves, then, a negative, and the *onus probandi* must be on the party who avers that full proof has been made, and that the judgment was rendered without collusion, because the assertion of his adversary is not susceptible of proof.

But if any *prima facie* evidence of collusion, and of that technical fraud contemplated by law, was indispensable, we think that it is furnished by the record before us. The insolvent's answer, filed by himself, apparently without the assistance of any counsel, or any previous citation, begins with a general denial, and goes on to state a number of facts upon which this judgment appears mainly to be predicated; facts which, in many instances, are disproved by the evidence. These circumstances, coupled with the close and suspicious relation in which these parties stood to each other, form, to our minds, a *prima facie* evidence of collusion, amply sufficient to put this party to the proof of her claim, independent of the judgment.

When approaching this investigation, we had strong doubts whether, in the conjugal, as well as in every other partnership, the party claiming a share in it should not first be held to prove a settlement of all debts due to third persons. It is true, that in the system of laws from which we have derived our community of goods and acquests, the interest of the wife in the property of the community was held to attach on its dissolution, subject to her right of renunciation. But, under those laws, a difficulty like the one presented to us could hardly occur. The sense of duty which should

EASTERN DIST. February, 1840.

ADAMS
*vs.*
HIS CREDITORS.

ticular claim, as a charge or allegation of fraud, must *avail all the other* opposing creditors, interested in defeating it; because a claim cannot be rejected as to some creditors, and upheld as to others.

The allegation of fraud and collusion against a judgment, puts the party in whose favor it is rendered, to the proof of the facts on which it is based.

prompt a surviving father to settle the community, was not trusted by the lawgiver to him alone ; on its dissolution, the ministers of justice stepped forward and took in hand the rights of the minor, or absent heirs.    Thus, a settlement was enforced, enabling the wife or her heirs to ascertain whether it was their interest to accept, or renounce.    Here, we are called upon, after a lapse of some twenty years, to say what was the situation of this community ; however, the opposing creditors not having raised this question, and its solution not being absolutely necessary in this case, we shall proceed with the investigation before us.

The claim set up by the appellee, may be considered by us, as it has been in the argument, under three distinct heads :

1. For moneys and notes, owned by Adams at the death of his wife.

2. For slaves, then existing, and since sold by him.

3. For immoveable property, the title of which was then in her father.

I. A number of witnesses have been examined, as to the reputed wealth of C. Adams twenty years ago ; some saw money, others saw negotiable notes, to large amounts, in his hands at different periods before the death of his wife.    It cannot be seriously expected of us to award any specific sum, on evidence of this description, vague, inconclusive, consisting mainly of the opinions of these persons, and contradicted, in many particulars, by the authentic evidence on file.    Most of the notes thus seen in his possession, were described as falling due some time after the death of Mrs. Adams ; hence, the appellee's counsel would have us infer, that the insolvent owned them at the dissolution of the community.    It is not enough for the appellee to render this probable ; she should make it certain.    But, to our minds, even such a presumption does not exist, for, pressed and embarrassed, as the evidence shows the insolvent to have always been, it is difficult to believe, that this negotiable paper, represented to be as good as bank notes, should have thus long remained in his hands, and Adams himself, in his answer to his daughter's suit, enumerates the slaves and

A party seeking to recover, must make his claim certain; it is not enough to render it only probable.

property which he owned, but says not a word of those notes, or of any credits then belonging to him.

II. As to the slaves, existing. at the dissolution of the community, and sold subsequently by Adams, no ownership is proved in any, except those attached to the Claiborne plantation. As to the others, the record shows, nay, it is admitted, that they were African negroes, smuggled into this state, in violation of our laws. With such evidence before us, can we listen to any claim for a partition of those slaves, or their proceeds? There is no principle better settled, than that no action can be maintained on a contract, the consideration of which is immoral, or prohibited by law. Here, the action does not, it is true, grow out of a contract, but as it has for its object to obtain a share, in partnership property, obtained by means of a nefarious and illicit traffic, we apprehend that the same rule must apply. "*Ex turpi causa non oritur actio.*" But it is said, that if those slaves, or their proceeds, are not good property for the appellee, they cannot be so considered for the creditors. We conceive that the latter stand in a position widely different from that of the appellee. They claim to be paid out of the general assets of their debtor, and have nothing to do with the manner in which he might have acquired any portion of them. Not so with the present claimant; she sues, as partner, for one-half of the very property thus unlawfully acquired. We cannot award to her any portion of it, without sanctioning the violation of those laws we have sworn to respect and enforce.

In relation to property acquired by illicit traffic, a partner stands in a different light from creditors; they claim to be paid out of the general assets of their debtor, the partner seeks for one-half of the property, unlawfully acquired, and cannot be listened to.

III. The three only pieces of landed property, of any importance, which Adams appears to have owned, are the *Claiborne*, the *Belle*, and the *Cropper* tracts.

The Claiborne place was purchased within one year before the death of insolvent's wife, for sixty-two thousand one hundred dollars, payable in several instalments, all falling due after that time. The evidence shows, that no portion of the price had been paid before the dissolution of the community, although Adams, in his answer to his daughter's suit, declares, that at that time he had paid twenty thousand dollars on that property. The first and second instalments,

amounting to upwards of thirty thousand dollars, have been paid by Adams after the dissolution of the community, and form against it a claim which, by his surrender, must have passed to his creditors. This plantation was afterwards seized, and sold to pay the balance yet remaining due. It brought forty-seven thousand seventy-five dollars, thus leaving a clear loss for the community in which the title was vested.

Notwithstanding Adams' declaration in his answer to his daughter's suit in the Probate Court, the title to the Belle plantation is proved not to have been in him on the 7th January, 1819 : Adams and Spraggins, who owned it, had, before that time, sold it to Brand and Foster for fifty-five thousand dollars, in notes payable from one to four years. But it is contended that as Adams, when he afterwards purchased back from Brand and Foster one half of this plantation, returned to them their own notes in payment, the community should be credited with their amount, deducting eleven thousand dollars (Adams' proportion of the original price yet unpaid.) This would leave for the community a profit on this property of sixteen thousand five hundred dollars, one half of which the appellee would be entitled to, should we grant her the benefit of the presumption that these notes continued to belong to him during all the intermediate time.

The Cropper tract, was purchased by Adams on the 18th of January, 1818 : for this property, we find Adams promising to give four negroes, and assuming the payment of a mortgage for four thousand seven hundred and fifty dollars, in favor of Durnford. This property was seized and sold to pay his debts after his wife's death, and brought fifteen hundred dollars over and above the sum of four thousand seven hundred and fifty dollars, yet unpaid.

Thus, we have examined more minutely, perhaps, than it was necessary, the facts upon which this claim rests; we have done so on account of the presumption of its correctness, which would seem to result from the judgment obtained by appellee in the Probate and District Courts : it will be seen that even without looking into the debts of the

estate, we could hardly allow any thing to have been proved as lawfully belonging to Adams at the death of his wife ; but the record abounds with judgments against him, ren- dered after the dissolution of the community it is true, but still for debts, many of which existed before ; and such of those debts as the record proves to have been paid by him since his wife's death, are so many just claims against the community, which have passed to his creditors.    Of the exact amount of his debts at the period the community was dissolved, it is difficult to form an estimate from the record ; but a close and patient investigation of the whole case, leaves no doubt, in our minds, of the utter insolvency of C. Adams, at the time of the death of his wife.

There has been little or no dispute about the claim of John Andrews.    As transferee of a twelve months bond, subscribed by insolvent, Robert Bell and Dela F. Heath, he claims a balance of three thousand three hundred and one dollars, yet due on it.    The property on which he contends for a lien to secure this balance, is called in the tableau, the " Iberville back-land," a description rather vague, but sufficient, however, we think, to show its identity with that described in the bond.    It produced a sum of five thousand dollars, on which this claimant has a special mortgage and a privilege.    *Article* 722 *and* 723, *of the Code of Practice.*

We next proceed to the consideration of the claim of the Mercantile Insurance Company.    It is based upon an assignment made to them in 1826, by the Life and Fire Insurance Company of New-York, of a mortgage debt, which originated in a loan from the assignors to the insolvent in 1824.    On this debt the Life and Fire Insurance Company had obtained in the U. S. District Court a judgment, which forms the title of the present claimants.

For the purpose of defeating this claim, numerous objections have been raised in argument ; we shall notice only such as have appeared to us material.

The assignment is said to be without proof.    It purports to be signed by the president and secretary of the company.    The signatures and official capacities of the persons signing as

EASTERN DIST. *February*, 1840.

ADAMS
vs.
HIS CREDITORS.

Where the signatures of the proper officers of a corporation are proved, and the seal is affixed, the courts are to presume the officers did not transcend their authority, and that the seal was affixed according to the requirements of the charter.

Courts may, however, when a deed is signed by the officers and sealed with the seal of the corporation, look beyond the seal, but it is *prima facie* evidence that it was so affixed by proper authority. The contrary must be shown by the adverse party.

president and secretary, have been proved ; but this is said to be insufficient. Appellee's counsel contends, that proof should have been given of the authority of these persons to act in the execution of this assignment. To this it is answered, that this Court is bound to presume that these officers did not transcend their power, and that the official seal of the company was affixed to the instrument according to the requirements of the charter. We hold the doctrine to be that, though a deed be signed by the president and secretary, or cashier of a corporation, and be sealed with its corporate seal, yet the courts may look beyond the seal. If it be affixed without the authority of the directors, and that fact be made to appear, the instrument will be declared null and void ; but the seal itself is *prima facie* evidence that it was affixed by proper authority, and the contrary must be shown by the objecting party. *See Angell & Ames on Corporations, chapter 6, section 7, page 114 ; Ibid., chapter 8, section 6, page 164 ; 6th Sergeant & Rawle's Reports, page 12.* It was, therefore, incumbent on the party objecting here, to have rebutted this *prima facie* evidence, by producing the charter and showing that other formalities not complied with, were required for the creation of this contract. But in looking into the pleadings in relation to this assignment, which is expressly alleged in the opposition of the Mercantile Insurance Company, we find that, far from denying the fact of the assignment, the answer of Andrews and wife, avers that the debt is extinguished by compensation, although no evidence whatever in support of this plea, was afterwards adduced. But besides this, a few months after the assignment, the insolvent accepted notice of the transfer, thus acknowledging the Mercantile Insurance Company as his creditors.

Prescription, fraud, usury, &c., have been successively urged in argument against this claim. These pleas might, perhaps, have availed appellee against the notes and deed of mortgage of 1824, but they cannot reach the judgment in which these evidences of debt are all merged. To this judgment itself, however, many objections have been made ; some of which would probably prove fatal, if this judgment

was before us for revision, either on an appeal or in an action
of nullity. But we have a judgment of the U. S. District
Court for the eastern district, rendered in 1826. It is based
on a compromise entered into between the parties, to stay the
execution of an order of seizure and sale, which had issued
against the Belle plantation, under the mortgage of 1824.

This compromise, by agreement, was to be entered on the
records of the court, in a suit then pending between the par-
ties, and is referred to in the decree which dissolves the in-
junction sued out by C. Adams, and at the same time grants
a stay of execution until the 18th of January, 1829, when all
the notes described in the original mortgage were to have
become due.

This judgment may be erroneous, the formalities required
by law may not have been pursued in its rendition ; but there
it has stood without contradiction for the last fourteen years,
and has thus acquired the authority of the thing adjudged.
It is said next, that the registry of this judgment in the
parish of Iberville, has not been renewed in pursuance of
*article 3333, of the Louisiana Code,* and that, therefore, the
mortgage no longer exists. To this it is a sufficient answer to
say, that the judgment was recorded in Iberville on the 20th
May, 1826, and that the insolvent made his surrender in
March, 1833 ; the mortgage was raised and the property had
passed into the hands of a third person, before the expiration
of ten years from the date of the registry ; a re-inscription
under such circumstances, would have been a most vain and
senseless proceeding ; but even the registry of the original
mortgage on which the compromise and judgment after-
wards intervened, was in full force when the surrender took
place, for ten years had not elapsed from its date, to wit :
24th January, 1824.

It is, therefore, ordered, adjudged and decreed, that the
judgment of the District Court be annulled and reversed ; and
it is further ordered, that the claim of Penelope Adams, wife
of John Andrews, be rejected ; that John Andrews be placed
on the tableau as a mortgage creditor on the proceeds of the

EASTERN DIST.<br>
February, 1840.<br>
ADAMS<br>
vs.<br>
HIS CREDITORS.

Iberville back land, for three thousand three hundred and one
dollars, with interest at the rate of ten per cent. per annum,
from the 8th of July, 1832, until paid.    That the Mercantile
Insurance Company be placed on the tableau as mortgage
and judgment creditors for thirty-two thousand two hundred
and eighty dollars thirteen cents, with interest at the rate of
seven per cent. per annum, from the maturity of the respec-
tive notes mentioned in their compromise and judgment,
until paid.

And, it is further ordered, that the case be remanded for
further proceedings to be had on a final tableau of distribu-
tion ; the costs of both courts to be paid by appellee.