## JOHN WILCOX *v.* HIS CREDITORS.

Persons claiming a part of the estate of an insolvent, as heirs of a deceased wife, on account of the community of gains, must establish their right to recover by adequate evidence. It will not be sufficient to render it probable.

APPEAL by Clark and others, trustees, and Josiah Barker, from a judgment of the District Court of the First District, *Buchanan,* J.

BULLARD, J. The syndic of the creditors of John Wilcox having filed a tableau of distribution, on which he placed the children of the insolvent, in the right of their deceased mother, as privileged creditors for their share of the community, which was dissolved in 1828 by the death of their mother, amounting to upwards of twenty thousand dollars, and certain creditors in New York, represented by Clark, Hunt & Philips, as trustees, or mortgage creditors for $25,206 08, and McCawley as a creditor with the vendor's privilege for a small note, various oppositions were filed, and from a judgment pronounced thereon, the present appeal has been taken.

The mortgage creditors in New York opposed the claim of the heirs of Wilcox's wife on the ground that the community was in point of fact insolvent, as well as on other technical grounds ; and they also opposed the claim of McCawley, as unfounded.   The heirs of Wilcox's wife  on the other hand, opposed the claim of the New York creditors, alleging that in consequence of their failure to comply with the conditions of their contract, the insolvent had suffered damage to the full amount of their debt, in the sacrifice of real estate, which was sold at a forced sale in consequence of their refusal, through their agent, to consent to a private sale for the purpose of paying the previous incumbrances.   The claim of the heirs was reduced to about two thousand dollars, and that of the New York creditors were rejected *in toto* by the judgment of the District Court.   The argument in this court has turned mainly upon these two debts ; and we shall consider the case as it relates ; *first,* to the New York mortgages ; *secondly,* as to the heirs of Wilcox's wife ; and *thirdly,* as to McCawley's claim.

I. Wilcox being indebted to numerous persons in New-York, on the 25th October, 1834, executed in favor of certain trustees a mortgage upon several houses and lots in New Orleans to secure the payment of their debts, amounting in all to $25,206 08, for which a great number of notes has been given which are set forth in the instrument of mortgage.   In this deed, which is in the common law form, nothing is said of any previous incumbrances upon the property ; but in a previous contract between the same parties, containing the preliminaries of the arrangement thus made, and which bears date the 10th of October, 1834, pre-existing mortgages are alluded to without being specified, and the trustees agreed, that notwithstanding their bond and mortgage, Wilcox should be at liberty to renew the present incumbrances by mortgages if he should think proper and feel himself constrained so to do, such renewed mortgages to have the same preference as they now have.   Then comes the clause which has given rise to this controversy :  "And it is further agreed by and between the said parties hereto, that said Wilcox is to be at liberty to sell any part or portion of the real estate so placed under mortgage, on his paying to the said trustees, or their attorney, or substitute, a proportion of the pur-

chase money, equal to the proportion which the whole mortgage security bears to the whole mortgage debt; and that, thereupon, the said parties of the first part, or their attorney, or substitute, shall release or extinguish their mortgage, on such property so sold."

It appears that, among others, there existed a mortgage in favor of Pritchard for about $15,000. In the autumn of 1834, Wilcox sold one of the pieces of property in Camp street to Lee for $11,000, but could not make a conveyance because Tulane, the agent of the trustees, refused to cancel the mortgage of his principals, unless Wilcox would pay a part of the purchase money to him in conformity to the agreement of the 10th of October. In consequence of that refusal the sale was not completed. This is the act of the trustees which is complained of as having caused great damage to Wilcox, and which damage the judge of the District Court estimated and assessed as equal to the whole balance of the debt, apparently due at the time of the trial. That was the only occasion on which Tulane, or any other agent of the creditors, declined to cancel the mortgage on any part of the property. The question then is, whether Tulane was bound, as the agent of the New York creditors, to release the mortgage under the circumstances shown by the record, and, if so, what damage did Wilcox sustain?

If the sale of the lot had been, as Sterrett, one of the witnesses, and who was the attorney of Pritchard, supposes, under an order of seizure at the suit of Pritchard upon his prior mortgage, it was idle to apply to subsequent mortgagees to give a release, because such subsequent mortgages became extinct by a judicial sale under the first. This we cannot suppose was the case; and it would seem from other testimony, that it was a sale at auction, at which Lee was the highest bidder, and probably was intended to provide for the payment in part of Pritchard's debt. The question then arises, was Tulane bound to release the mortgage of his principal upon that property, and if so, what damage did his refusal occasion to the insolvent?

The construction of that part of the agreement has been the subject of much argument and even conjecture. If we understand it, literally, it is clear that in no case were the New-York creditors

bound to release their mortgage upon a sale of the property, without receiving a part of the price. What that proportion was to be, it is difficult to understand. The contract of the 10th of October makes two distinct agreements :—*first*, as it relates to pre-existing incumbrances ; and *secondly*, as to the sale of the property by the mortgagor. To provide for prior liens, Wilcox was authorized to renew the mortgages, to novate them, or create new ones ; and such new mortgages were to take precedence of that of the New York creditors. By the second clause, he was authorized also to sell ; but upon the condition of paying over a part of the price. It may be said that the parties did not contemplate providing from the previous incumbrances by a private sale—for it would have been absurd in that case for the creditors in New York to stipulate for a part of the price unless what remained after paying the first lien. The previous mortgagees could not be expected to consent to that, and no provision is made for their concurrence. It is impossible to give effect to every part of the agreement, without supposing, that the creditors in New York intended that provision should be made for prior mortgages by facilitating Wilcox in making payments by renewing the mortgages, and that after such incumbrances should be paid off he might still have the privilege of selling at private sale, provided each creditor represented by the trustees should be paid a part in proportion to his debt. Even upon this hypothesis the obscurity is not entirely removed. But it is less important to ascertain the probable meaning of the parties, than it is to decide whether heavy damages were incurred in consequence of the agent of the trustees putting a literal construction upon the contract. In the first place, if the sale to Lee was a fair one and for a just price, and the proceeds had been paid over in extinguishment of Pritchard's mortgage, neither Wilcox nor the New York creditors would have had a right to complain, even if Tulane had not released the mortgage of his principals ; because the payment would have benefited both the parties, and especially the trustees, by enhancing the value of their pledge and giving them the precedence on the remaining property. Lee alone had reason to fear both Pritchard and the other creditors, because the price he was to pay was not sufficient even to extinguish the mortgage of the former, and the sale was not a judicial one.

But supposing Tulane to have been mistaken in his views of his duty, and of the construction of the contract, what damage did Wilcox sustain? If, on the failure of the contract with Lee, in consequence of the conduct of Tulane, the agent, Wilcox had claimed damages in a direct action against his principals, the creditors in New York, what would he have been entitled to recover? At most, we should suppose, the difference between $11,000 and what the same property afterwards brought on a forced sale. Nothing shows that the whole mortgaged property was sacrificed, as a direct consequence of the conduct of Tulane. A new negotiation might have been opened—an appeal might have been made from the agent to the principals. Nothing of the kind appears to have been done or attempted. It does not even appear that Tulane had any assurances that the price of the lot would be appropriated to pay off Pritchard's mortgage. How could he have justified himself to his constituents if he had given the release? They may have reminded him, that according to the literal tenor of their contract, he was to release only upon certain conditions, and it was not for him to say that those conditions were absurd. If, through the fault of Tulane, his constituents are condemned to heavy damages, is it not just that they should have their recourse over against their agent? And if they were now to sue Tulane, to make up to them this loss, would he not silence their complaints by saying, that he had acted in good faith, and ought not to be punished for the obscurity or ambiguity of their own contract? They should have been more explicit. In short, from whatever point of view we regard this question, we are by no means prepared to say, that Wilcox has shown enough to entitle him to be entirely exonerated from the debts due to his New York creditors, and still less, that the other creditors are entitled to profit by it, in the form of a reconventional demand.

II. The heirs of Wilcox's wife were allowed about $2,600, as their share of the community formerly existing between the insolvent and his wife, who died in 1828. No inventory was taken, and it is not shown that any tangible property existed at the time. But it is said by the district judge, that there appears on McDougall's books a balance in favor of Wilcox, on the first of June, of $5,285, which was settled by cash and bills in November, 1828,

after the death of Wilcox's wife. This evidence is not, in our opinion, sufficient to establish the claims of the heirs, on account of the community of *acquets* and gains. The case is analogous to that of *Adams* v. *His Creditors*, 14 La. 460. No liquidation of the community is shown, and the evidence either of rights or debts is extremely vague ; and parties claiming under such circumstances, must show something more than probabilities. The impression left upon our minds from an attentive consideration of all the evidence, is that the community was insolvent.

III. With respect to McCawley's claim to be set down as a mortgage creditor, for the amount of a small note of $312, the evidence shows that he has no claim whatever. He admits himself that he has been paid the amount of the note. No person claims as subrogated to his rights in virtue of the payment.

It is therefore ordered that the judgment of the District Court be avoided and reversed, so far as it relates to the claim of the heirs of Wilcox's wife, and of Clark, Hunt & Philips, as trustees of the New York creditors ; and that the tableau be further amended by striking from it the claim of the said heirs, and by reinstating Clark, Hunt & Philips, trustees, as mortgage creditors for the amount due upon the said mortgage, to wit, the sum of $23,667 31, with interest at seven per cent. from March 27, 1841 ; and that the tableau in other respects remain as by the judgment of the District Court ; and that thus amended it be homologated and approved. The costs to be paid by the mass.

*G. B. Duncan*, and *Barker*, for the appellants.

*McHenry*, and *Mazureau*, for the appellees.