On Rehearing.
Ilslev, J.
This case, on the claim in intervention, is again before us upon a very elaborate and able oral reargument, for which ample time was allowed to the counsel of the intervenor and the bank, respectively, to educe and cull from the mass of discrepant testimony, the particular facts upon which each party relied; and from the scrutinizing exposition of the whole case so evolved, we are now enabled to form an opinion more satisfactory and reliable than our first one, in which the testimony was not so thoroughly sifted on both sides as it is now.
The case is fully open for re-examination, regardless of any predication or particular form of expression, used in our first opinion.
It devolves on the intervenor to make his claim certain, and it would, perhaps, have been more regular to examine first his case as he presents it; but as the bank does not rely solely upon its possession of the cotton claimed, we will proceed to ascertain upon what kind of title its possfession thereto rests.
The bank shows that, sometime in the year 1863, it had purchased beyond the lines of the United States military occupation, some eleven thousand bales of cotton, in which it had invested a large amount, aváilable as current funds, at the time when, and at the place where, its purchases were made.
That portion of the cotton purchased by the bank in Black, Tensas and Red rivers, had been carred above Shreveport and deposited' among the lakes.
Purchases were also made by the bank in the parishes of Bossier, Claiborne, DeSoto, Caddo and Natchitoches, which were not moved.
With this cotton, the agent of the bank, with á number of men employed by him, had remained as much as possible; and at the end of the war, as the witness, Stevenson, proves, he had in his charge, out of the original purchases, between 8,000 and 8,500 bales. He collected’ together from all the points, and shipped,-, as he says, to New Orleans, consigned *478 to the Louisiana State Bank 7,250 bales, the remainder being lost in rebaling,; in short deliveries, and by stealing.
From the testimony of this, and other witnesses for the bank, and by admissions frankly made by the intervenor’s counsel, at page 2 of their brief, we are satisfied as to the quantity of cotton purchased and saved by Stevenson, as the agent of the bank, and his assistants, at the time when, and the localities where these purchases were made, and the points at .which the cotton was kept.
Was the cotton thus purchased, laden on the steamboats Texas, Doubloon,. Louis D’Or .and Beauregard?
As to the cargoes of the Texas and Doubloon, the intervenor, at p. 21 of his brief, says: “ The witnesses, on the part of the bank, proved the purchases by Stevenson as above,” in his brief, “ admitted, and showed that,the Texas and Doubloon received their cargoes at different points on Lake Caddo, brought them thence to Shreveport, and afterwards to New, Orleans; but, as before asserted, no part of the cargoes is shown, except by Stevenson, to have been made up of the collon purchased by the bank in 18,63.”
The “different points on Lake Caddo, “were those” at which the intervenor says, (page 21 of his brief) “ that previous to the month of July, 1863, Stevenson, as the agent of the bank, had purchased cotton on the Black and Tensas rivers, and had shipped about 2,000 bales by the steamer Osceola, to different points on Lake Caddo.”
In this connection, Stevenson says: “I went myself with the steamboats Doubloon and Texas into Lake Caddo, above Shreveport, where I loaded said two boats with cotton that I had previously carried there, with the steamboat Osceola, and with cotton that I had purchased at Monterey landing, situated on a small bayou, emptying into Lake Caddo, in Texas, but a few hundred yards beyond the line that separates it from Louisiana. This is corroborated by other witnesses, and the currrent of testimony shows that the largest portion of the cargoes of these boats was in wretched condition, the bagging and ropes rotten, many of the bales .burst open, which was the state of it, as proved by the bank, when it reached New Orleans.
With reference to the cargoes of the Louis D’Or and Beauregard, the interyenor says, page 21 of his brief: “We are not disposed to deny that, in the early part of 1863, and during the same period in which the Osceola was engaged in carrying cotton to Lake Caddo, Stevenson purchased a considerable amount of cotton in Louisiana, Texas and- Arkansas, ¡and left it at that time on the several plantations where it was bought; but we have to say, relative to the cotton on the Louis D’Or and Beauregard, as we have already urged regarding the cargoes of the Texas and Doubloon, that “ there is no evidence except that of Stevenson, to. identify the cotton in these two steamers, with that purchased for the bank in 1863, and left upon the plantations.
Stevenson thus particularizes, as to the cargoes of the Louis D’Or and Beauregard. These boats were loaded “ partly with cotton, brought by the steamer Dixie from Frank Armor’s plantation, above the Raft, and partly with cotton brought from Monterey on the steamboat Blantas. The Beauregard was loaded with some 300 odd bales of cotton at John *479 Pickett’s plantation, above Shreveport, and the remainder of her cargo" was put on at Shreveport, with cotton, partly brought on wagons, arid' partly with cotton brought in on the small steamboat Blantas, from Monterey and Wilson’s point.
The condition of this cotton was similar to that of the cotton on the1 Doubloon and Texas, generally covered with rotten baling arid rope.’
The bank’s case as thus presented, is this: That with ample pecuniary' means in 1863, it then purchased large quantities of cotton, which weredeposited at different points; that at the expiration of the war, there remained out of the whole lot so purchased, some 7,250 bales at those' points, and that the cargoes of the Texas, Doubloon, Beauregard and Louis D’Or wore shipped at, or consisted of cotton brought from, those *' designated points.
Prom these facts, in the absence of any evidence to prove the previous' removal of this cotton from these depositories, respectively, or its destruction there, it may be reasonably inferred that that cotton formed the' cargoes of the four boats.
To destroy the presumption which the law raises in favor of the bank, ’ and to confute the positive testimony of Stevenson and other witnesses, the intervenor offers countervailing testimony, by which he undertakes' to establish the following state of facts:
That at the time of the evacuation of Alexandria by the United States' army, he owned in that place some 4,000 or 5,000 bales of cotton, all baled in new india bagging, and on which, or a large portion of it, figured the mark “A. Q. M.,” “D. N. W.,” “W. B.”
That the bulk of this cotton had been shipped in góvernnlent trains-' ports for transportation to New Orleans, but were afterwards thrown’ ashore under the river bank, along and opposite the town of Alexandria; that owing to the peculiar position of this cotton under the bank bf the’ river, it escaped destruction by fire when the town was burnt; that this cotton, after the capture of the town by the Confederate army, found its' way up Bed Biver to some points at, or in the vicinity of Shreveport, or' above or circumjacent thereto; and that the cargoes of the Doubloon,' Texas, Louis D’Or and Beauregard, consist of the identical cotton so ’■ owned by him in Alexandria.
To identify the cotton, the intervenor produces, and relies upon, 'the: testimony of four witnesses, to-wit: John L. Coates, John W. Martin, 'J:’ F. Moliere and T. H. Bradley, aud this is the only testimony we deem it'' necessary to examine, as we will consider established the factj that the' intervenor had in Alexandria a large quantity of cotton, with descriptive'' marks, which escaped destruction by fire.
J. J/. Coates was United States treasury agent for northern Texas. He' arrived in Shreveport from New Orleans for the first time on the 7th June, 1865, and remained there till he left for Marshall, Texas, arriving there forty-eight hours after leaving Shreveport, about the 11th or 12/A of the' same month.
Previous to leaving Shreveport for Marshall, he acted as assistant of Breckinridge, the local treasury agent at Shreveport.
He went on board the Doubloon arid Texas, lying at Shreveport, to’ inspect their cargoes, to know if they had any contraband cotton on *480 -bpárd.' thesfiboafe were deeply.lacíen. líe found all the cottonmarked ‘‘ J. A. S.,” which "Breckinridge had tol'd.him'meant John A. Stevenson; -and. “-with ¡that'.lie had .nothing to, do, as it had been, arranged.”
But sfcill he proceeded to' examine this J'. Á..-S. cotton, and he found ,on the hale?-so.-marked other partial marks, W; and-B., WB., and some on thn'edge “A. Q. M.”
The J. A. -S- Ivas over some, other mark that had evidently'been changed; ■He remembered no mark of two, letters.
The bales' were uniformly, not remarkably laige, and wefe covered with india bagging apparently liew.

die.does not know'how-piany bales there were of this méde or peculiarity; but ■Jie saw'.enough Jo lead him to suppose the whole cargo was'the same.

These two boats would reach New Orleans' about the 15th June.
This is,.all Coates says about the, cargoes of the -Doubloon and Texas.
The letters W. and B. and WB., pn the bales inspected by Coates, do .not correspond-with the mark on the .Bailey,. Alexandria cotton,'.which 'was WB. connected. If iri cargoes Of cotton, densely packed, Coates could--see,enoiigh jto lead him to suppose the whole cargo was the same as the'bales he" dicl examine, -still no identity iá shown between these-cargoes and the Alexander cotton, unless the A. Q. M. and the new india bagging oh hales, marked W.‘and B. and WB., sufficed to metamorphose‘this particular mark into another one, as distinctive as it.
As no. cotton, on either of these boats was found maiked WB. it might ,:be inferred that other cotton, besides the Alexander cotton, had the le t ters A. Q. M., and was baled in new india bagging.
-As ' to .-the inspection of the cargo of the Doubloon, it is somewhat .strange that the máte of that boat had no knowledge of it, apd that not a bale was moved .to make the inspection.
Coates .'afterward*?, .in his said'¡capacity of-revenue officer,-made an .irtspeetion on the Louis D’Or, and found on her the same character .of cotton, the same bagging and erasures, as he had found on the Doubloon .and Texas.
-His -reason for making this last inspection, was his having heard in ¡Marshall, that -the agent of Stevenson had .caused the marks to.be changed on 67 bales of other cotton, by substituting J. A. S. therefor, -and-for .this Steyenson was arrested.
’'' He -found on the Louis D’Or, the WB. chiefly on the ends of the bales, 'and the marks A. ,Q. M. on the edges. .He found difficulty in deeiphering .the .marks, -because some of the marks were cut out at the edge, but by placing the pieces .together he made out the A. Q. M. It was by the application of turpentine, he discovered the J. A. S. was marked over the WB.
Ho w-,many-bales so marked were on the Louis D’Or, Coates did not say,, nor doe„s he, say that'from .what he did see on that boat, he w,as led ,-tó suppose the whole of .the cargo was the same.
This indefinite statement, in regard to the cargo of the Louis D’Or, was occasioned-probably-by the fact that any inspection he made on that boat was during the night of the 17th or I8fch June, as .from the account Coates gives of his movements from his first arrival in Shreveport, it could .only-have been ¡made then.
*481 Be this as it may, apart from the hugeness of the supposition of Coates, as to the character of the whole of the. cotto’n on the .Doubloon and Texas, his testimony, when analyzed," amounts to very little!
John W. Martin, the next witness, followed various avocations', principally that of steamboat man, and was' in Alexandria between. 1862 and 1864, and was frequently on Bailey’s plantation! Bailey had a large press, and , his bales would average 550 lbs. Bailey had, he supposes, some 4.000 or 5,000 bales in Alexandria; of which there must have been some 3,000 bales in new india bagging. He saw Rachel marking it almost every day D. N. W., on the edge of the bales, which had in the original mark WB. He only looked at this, cotton casually, and his attention .was not particularly called to it; yet he recognized this cotton on board of the Louis D’Or and Beauregard at Shreveport, some fifteen mouths afterwards. .
He remarked to people about there, “ that must be some of old man Bailey’s cotton.”
He saw some he could not distinguish, with the mark WB.' He could see enough to tell it had been WB.
It had been partly obliterated, by tearing the bagging, apparently by design.
On the Louis D’Or, there “ must have been ” some 300 or 400 bales, and on the Beauregard some 100, 200 or 300 bales! and the two boats must have had 500 or 600 bales.
He was watching cotton casually, but saw nothing particular about the cotton on the Louis D’Or and Beauregard.
His attention was first attracted to the cotton, by the marks being partly obliterated, and the bagging new, and the bales large, and its resembling the bagging he had seen on the bales at Alexandria.
He cannot tell exactly now, what portions of the WB. were obliterated, and what remained; enough, however, to distinguish the cotton. He examined 200 or 300 bales, on which the mark was obliterated, but lie does not know that he examined any of them particularly.
He pulled the bagging aside, and examined some 4, 5 or 6, but he did not see the quartermaster's mark on a single bale; only the bagging ‘torn off at the edge. He did not examine any particularly; there was no use to do so; eight or ten inches were cut out. He was pulling down the bagging, so as to make the letters WB. come together. When he brought •the ragged parts together, he discovered it was the same mark he had seen in Alexandria.
It may be observed here, that Martin was employed by McKee .to watch for Confederate cotton. His testimony amounts to this: He saw in Alexandria in 1864, a large pile of cotton, some 3,005 bales, which he looked at casually; but he remembered the mark WB., D. N. W., but not the A. Q. M., the size of the bales, and the kind of bagging which" covered them. He finds the WB. on a few bales; the mark obliterated on 300 or 400 on the Lo.uis D’Or, and on the Beauregard 100, 200 or 300 bales; in all, some 500 or 600 bales. There was not a sign of the quar•termaster’s mark upon it; only where it might have been, and the Court *482 is to infer from this testimony, that there "mud have been” 500 or 000 bales on the two boats, belonging to the intervenor.
The next witness is John F. Moliere.
At the request of the intervenor, he accompanied him to the levee at New Orleans. This was about the middle of June, 1865. They went on board several boats, the Texas, Doubloon, Frolic and Pauline, (is not positive as to the Pauline) to see if they had any of Bailey’s, the intervenor’s cotton on them. This witness says he had seen Bailey’s cotton at Alexandria. He had there some 4,000 or 5,000 bales, maybe more. This cotton was marked D. N. W., A. Q. M., WB. The bagging covering it was new India bagging, which the quartermasters had brought pp from New Orleans, to distribute among loyal people. Bailey’s bales were very large, say 450 or 500 lbs.
There was a peculiarity on the baling, which Bailey explained to him, sis being caused by a defect in his press.
The rope was so far from the end, being about eighteen inches, that it made the ends of the bales swell out unevenly, thereby causing a difficulty in storing it. •
Most all the cotton had the appearance of being the same lot of Bailey’s cotton he had seen at Alexandria. On this lot (on the Doubloon, Texas, Frolic and Pauline) some 25 or 30 bales had on them the WB. quite visible.
The mark was considerably worn, yet the mark WB. could be easily-distinguished on the 25 or 30 bales. He noticed the ends turning up, and they had the same appearance as those he had seen in Alexandria, the same india bagging in appearance, comparatively new, but it had been hauled about a good deal.
On the edges of the bales in some places, by turning up the ravelled part, you could see occasionally an A. or an M. Q. D. or a W. It looked as if the mark -had been intentionally defaced. How many the witness examined on these boats he does not inform us, nor on which of the four boats (Doubloon, Texas, Frolic and Pauline) he found 25 or 30 bales marked WB.
He went afterwards on the Louis D’Or and Beauregard, and found the WB. on 8 o.r 10 bales, but could see that the whole or most part of the cotton had been tampered with, ends cut off, edges cut and ravelled.
He did not look on the Louis D’Or and Beauregard to find the letters D. N. IF. A. Q. Ml, although he was employed by Bailey to hunt up his cotton. There might have been 50 or 60 bales on all the boats on which the witness could see a 1). AT. W A. Q. or At.
. On all the six boats, there were altogether 6,000 or 7,000 bales, out of which 2,500 or 3,000 bales had the same appearance by the bagging, defaced marks, raised ends, as he had seen in Alexandria, claimed by Bailey.
.What proportion of the 300 or 400, or of the 2,500 or 3,000 bales was on the Frolic or, Pauline, (neither cargo of which is in controversy) we are left to conjecture. This witness speaks of a striking peculiarity, not observed by the other witnesses, which would have been, from his description of it, a distinctive mark for identification; but how, in six or five boats, piled with cotton, forming a solid mass, and on two of which boats *483 there was not a bale, any one could form any estimate or an approximate of the 2,500 or 3,000 bales of, or like, Bailey’s cotton, out of'compa'ct piles of 6,000 or 7,000 bales, it is difficult to conceive. -v ’
All that this testimony, if it were consistent ‘with itself, would prove, is, that on the Doubloon, Texas, Frolic, and perhaps the Pauline, the witness found some 25 or 30 bales, with the WB. and other characteristics, and this is rendered doubtful, by the iact that on two of the boats on which they were discovered, there was not a single bale claimed from the bank. 1
The WB. on 8 or 10 bales on the Beauregard and Louis D’Or would be more reliable evidence, if being employed to hunt up Bailey’s cotton, the witness had thought of looking on those boats for the occasional B. W. W., A. Q. M, which he failed to do.
The next and last of the four witnesses called to identify the intervenor’s cotton, is T. II. Bradley.
He was a printer by trade, and had lived in Alexandria, having known the intervenor eight or nine years.
He knows the intervenor had a large quantity of cotton there. He saw one Rachel and his son marking the cotton with [the letters D. N. W., A. Q. M., WB.
He only saw this cotton casually, and was not employed to examine it carefully. He saw it, however, sufficiently to recognize it again. Being in search of the intervenor, he found him at the levee at New Orleans, where the Doubloon and Texas were discharging their cargoes. • He was greatly excited, pointing out some of the cotton, which lie swore was his.
There “must have been” 20 or 25 bales that had WB. on them, in the same‘shape as that at Alexandria. There were not a great many that the letters B. BT.W. A. Q. M., could be seen; but some 150 or 200 bales had the bagging cut out of them. He could discover some portions of .the letters where the B. N. W. A. Q. M. had been put on. They had been cut out, but by putting the pieces tqgether, parts of, but not all of, the letters could be made out.
. Later, he found on the Louis D‘Or and Beauregard 15 or 20 bales with the WB., which could be distinguished, and some portions of other letters, where the B. N. W. A. Q. M. had been cut out, but on which was an occasional M. or A., etc., not the whole.
The bales were in a very ragged condition, but about 300 or 400 were found cut and marked.
At the request of the intervenor, he found his estimate of the portion of the cargoes on the four boats, which had a similar appearance with the Alexandria cotton, and adopted the identical estimate made by Moliere, 2,500 or 3,000 bales.
■ But, comparatively, few bales could be recognized by marks. This witness, however, who had. only seen the Alexandria cotton fourteen months previously, and whose attention had not been called to it, recollected the letters marked on it; their groups, and where they were marked, their size and appearance of the bales, the kind of bagging, indeed every particularity in regard to them, oxcept the very remarkable *484 appearance of the bales; caused by a defect in the intervenor’s press, so well described by one other witness.
This is all the testimony in the recoi’d to prove identity between the cotton brought to New Orleans, by the bank, and that which the intervener had in Alexandria, and -as it'is upon that evidence that the whole, or a- large portion of the cargoes of the Doubloon, Texas, Beauregard and Louis D’Or are claimed for the intervenor, we have examined it thoroughly.
Reading this testimony, separately and collectively, and with the oarn■est deSire'to-ascertain the. truth and the whole, truth of the case, so as to award the cotton in controversy to the party who may prove his right to it, we are constrained to say that the testimony of the interveuor, poised against that adduced by the bank, which is irreconcilable with it, particularly as to the external appearance and condition of the bales, when "Shipped and when discharged at New Orleans, does not, except for a very fetv bales,'produce that legal certainty which is absolutely essential to the recovery of property to which title is asserted. , •
10 M. 419. 14 La. 455. 2 Rob. 27. 19 La. 206. So long as the presumption of the bank’s title, resulting from its possession of the bulk of the cotton, was not rebutted by contrary proof, it was not incumbent on it to show, although we think it did show, with reasonable certainty, when,- where,,- and how it. had acquired, the cotton sought to be taken from it.
It is true that Stevenson, the agent of the bank, occupies in the suit in intervention, a prominent position as a witness for the bank; but his .testimony, as to. his purchases and storing the cotton for the bank, does not seem to.be rebutted.
True, as we said in our first opinion, Stevenson could not be everywhere, but his sole occupation at the time was to attend to his purchases, and to have them put at available points. So far as he testifies, as to his illicit movements in purchasing cotton, storing and shipping it, it suffices to say his testimony is not rebutted.
With-the ' exception of thirty-five. bales on all the boats, which the intervénor’s witnesses say they positively identify by marks, and for which allowance will be made, we think the scale turns almost entirely against the intervenor. But were the balance equipoised, the fact that the District Judge who tried the ease, and who had ample opportunity to observe the deportment of each witness who was examined before him, and to see'hó w his evidence was given, decided the case of the intervenor ¿gainst him, in favor of the bank,
The cotton was shipped On the four boats, all of which left Shreveport without hinderance or molestation on the part of the vigilant government 'officials' there; who had made or caused to be made such important discoveries respecting their cargoes, and at the time.the claim in intervention was set'up, nearly all the cargoes of the four boats were in possession of the bank.- > - - - ,
“ In pari causa possessor hoheri debet, et pro rei possessore in dubio est ■prom'i/ntiandum. ”
'•Eroffi the thirty-five bales now awarded to the intervenor, must be *485 deducted tlae government quota, one-fiftli, or seven bales; thus, reducing the number to twenty-eight hales.
Allowing for each bale, according to our first computation, ,one hundred and fifty-four dollars, it yields an aggregate of four thousand three hundred and twelve dollars, for which judgment will be rendered for tbe intervenor. , ,
It is therefore ordered, adjudged and decreed that our first judgment on the demand in intervention of William Bailey, be so amended .as to reduce the amount allowed thereby, to the sum of four thousand three hundred and twelve dollars, (84,312) and no more; and so far as our first judgment is not in conflict with our present decree, it is affirmed.
We concur in this decision.
Zenon Labaijve, Associate, Justice,
R. K. Ho weed, “ “
Tari arerró, J.
I think the judgment first rendered in this case should not be altered, and, therefore, dissent from the opinion of the majority of the Court.
Hyman, C. J., dissenting.